**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| JUNIOR VOLLEYBALL ASSOCIATION OF | § | |
| AUSTIN d/b/a/ AUSTIN SPORTS CENTER, | § | |
| and AUSTIN SPORTS CENTER, LLC, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 1:17-cv-00756 |
| | § | |
| SUMMIT HOSTING LLC, fka | § | |
| SOFTWARE LINK HOSTING, LLC, | § | |
| fka SOFTWARE LINK, INC., | § | |
| *Defendant*. | § | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs Junior Volleyball Association of Austin d/b/a Austin Sports Center and Austin Sports Center, LLC (collectively "Austin Sports Center" or "ASC") and file this their First Amended Complaint complaining of Summit Hosting LLC, formerly known as Software Link Hosting, LLC, formerly known as Software Link Hosting, Inc. ("Software Link" or "Defendant"). Austin Sports Center would respectfully show the Court the following:

**I.  Parties**

1.       Plaintiff Austin Junior Volleyball d/b/a Austin Sports Center is a Texas non-profit organization with its principal place of business in Travis County, Texas.

2.       Plaintiff Austin Sport Center is a Texas limited liability company with its principal place of business in Travis County, Texas.

3.       Software Link was a Georgia corporation at the time it entered into the contract at issue, which subsequently converted into a Georgia limited liability company, and conducts business in Texas.  Software Link changed its name to Summit Hosting LLC on November 3, 2016.  Software Link has appeared herein.

## II.  Jurisdiction and Venue

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), in that this action is between citizens of different States, and the amount in controversy exceeds $75,000.

5.     Venue is proper in this Court, in that Software Link's conduct includes soliciting Austin Sports Center's business in this District, and because Software Link removed this case from the State district court in Travis County, Texas, within this District.

## III.  Nature of Claim

6.     Software Link entered into a contract with Austin Sports Center dated February 3, 2012, under which Software Link was to serve as a cloud hosting site for "all data and information relating to the business" of Austin Sports Center.  Software Link agreed to "protect and safeguard" Austin Sports Center's data and information, and that such efforts would be "no less than what Software Link uses to safeguard its own confidential information."  It agreed that it would "assume responsibility" for performing, managing, and verifying "the backup and restore processes for the Data," and would maintain a "back-up tape or electronic copy" of the data.  It agreed that it would perform multiple daily backups to "insure data is secure," as well as "7/24 Server Monitoring" of the data.  In support of those statements, Software Link represented during negotiations that its data center had multiple servers backing up data and that it kept 30 days of backup records for client data on them.  In the event any data was lost, Software Link agreed that it "will recover the production database" and that "Software Link will restore data from back-up tapes as requested by Client."

7.     Software Link subsequently lost all of the Austin Sports Center data that had been entrusted to it, and in the course of its failed attempt to recover the data, admitted to the falsity of its prior oral and written representations regarding its services and the levels of protection is had

in place.  Austin Sports Center asserts causes of action against it for breach of contract, fraud in the inducement, and violations of the Texas Deceptive Trade Practices Act ("DTPA").

## IV.  **Facts**

8.     *Austin Sports Center's business*.  Austin Sports Center specializes in all aspects of youth volleyball, including Club teams, camps, clinics, tournaments, rental facilities, and merchandise.  Each year, Austin Sports Center employs approximately 200 full-time and part-time staff members, and provides services to over 50,000 athletes, coaches, and parents through local training programs, team memberships, and national competition venues.  It hosts the largest national qualifier for youth volleyball in the United States, with approximately 1,800 participating teams and over 80,000 spectators.  Over 330 of its student athletes have continued their volleyball careers in college.  Austin Sports Center currently has three sports facilities in the Austin area, and is in the midst of expanding to a fourth facility.

9.     *Negotiations with Software Link*.  In January 2012, Software Link and Austin Sports Center began negotiating for Software Link to serve as a cloud data hosting site for Austin Sports Center's valuable data, including Austin Sports Center's financial and QuickBooks data. That data is fundamental to Austin Sports Center's ability to operate as a business.

10.     On January 12, 2012, Austin Sports Center's Tucker Koch spoke by telephone with Software Link's president and owner, Stanley Kania, regarding the services that Software Link would offer.  Kania discussed that Software Link performed multiple daily backups to insure that data is secure — the same representation that appears in the contract the parties ultimately signed — and explained that Software Link's data center had multiple servers backing up data, so that Software Link had the ability to pull history if needed.  Kania represented that Software Link kept 30 days of backup records for client data.

11.     On January 18, 2012, Koch and another Austin Sports Center employee, Scott Clouse, had a telephone conference with Software Link's Senior Network Engineer, Brian Wilder, and again discussed Software Link's backup process.  Wilder represented to Koch and Clouse that Software Link had multiple servers at Software Link's offsite data center which would back up Austin Sports Center's data in the event that the primary server failed or was otherwise destroyed.

12.     _Entry into Agreement, on form supplied by Software Link_.  Relying on these representations, Austin Sports Center entered into a contract with Software Link dated February 3, 2012 (the "Agreement"), for Software Link to host Austin Sport Center's data for a fee of $1,600 per month.[1]  In November 2015, the Parties agreed to an amended monthly fee of $775 per month.

13.     Except for filling in blanks for date, monthly price, signatures and initials, and client contact and credit card information, the form of the Agreement and all of its substantive terms were drafted entirely by Software Link, including the contractual representations about the scope of the services that Software Link represented it would perform, and the contractual representations about the safeguards that Software Link allegedly had in place and would perform to "insure data is secure."  Any ambiguity in the language and in any of the substantive terms of the Agreement consequently should be construed against the drafter, Software Link.[2]

---

[1] An enlarged copy of the one-page Agreement is attached as Exhibit A (with a redaction to cover a now-expired credit card number on the contract).

[2] _Longoria v. Delgado_, 2013 WL 4048546 *5 (W.D. Tex. Aug. 9, 2013) (Lane, J.) ("If the language of the contract is subject to two or more reasonable interpretations or meanings, it is ambiguous.  Under Texas law, a contract may be construed against its drafter after application of ordinary rules of construction leave reasonable doubt as to its interpretation.") (citations omitted);  _Ramirez v. United of Omaha Life Ins. Co._, 872 F.3d 721, 727 (5th Cir. 2017) ("If the policy language is ambiguous, then the court should construe the policy against the drafter, United, under the rule of _contra proferentem_.");  _Service Steel Warehouse Co., L.P., v. McDonnel Group, LLC_, 690 Fed. Appx. 869 (5th Cir. 2017) (per

14.     *Software Link's contractual obligations*.  The Agreement makes clear in multiple places that Software Link itself (not some third party) was responsible for the contractual services and safeguards.

15.     The "Data" for which Software Link assumed responsibility is broadly defined in the Agreement to include "all data and information relating to the business of Client and its affiliates provided to, generated, collected, processed or stored by Software Link in connection with the Services, including any data contained in reports required to be provided by Software Link to Client under this Agreement."[3]   Software Link acknowledged that the Data is confidential and proprietary to Austin Sports Center, and further represented in writing that Software Link's efforts to "protect and safeguard" Austin Sports Center's Data would be "no less than what Software Link uses to safeguard its own confidential information."  The Agreement elaborated on the multiple services and safeguards for which Software Link took responsibility:

- "Software Link will assume responsibility for performing, managing, and verifying of the backup and restore processes for the Data."

- "A back-up tape or electronic copy of Data will be maintained offsite or in Software Link's disaster recovery site as determined by Software Link."

- "If Data is lost from either system outage or application error, Software Link will recover the production database to a specific point in time, based on the most recent available backup."

- "In addition, Software Link will restore data from back-up tapes as requested by Client."

- "Services Included … Multiple daily backups to insure data is secure."

- "Services Included … 7/24 Server Monitoring."

- "Services Included … 7/24 access to your applications via the internet."

---

curiam) ("We agree with the district court that the bond language is ambiguous and should be construed against the drafters, Defendants-Appellees.").

[3] The use of emphasis in quotations herein is "emphasis added" unless otherwise specified.

16.     Austin Sports Center reasonably relied on Software Link's multiple oral and written representations in entering into the Agreement and entrusting its Data to Software Link, including its representation that backup copies of Austin Sports Center's Data were being maintained by Software Link, and that the supposed backups provided an extra layer of security and protection for Austin Sports Center in addition to Software Link's primary server.

17.     *Software Link's renewed assurances*.  Software Link's Senior Network Engineer, Brian Wilder, traveled to Austin between September 9-11, 2012, at Austin Sports Center's expense, to collect Austin Sports Center's Data, and to confirm Austin Sports Center's internal network and IT Process and make sure that all of Austin Sports Center's networks were secure. Wilder toured all of Austin Sports Center's facilities, and reviewed its IT/network setup.  In conversations with Koch and Clouse during the visit, Wilder represented that Austin Sports Center did not need to put an in-house server onsite because Software Link "provided multiple backs ups" at its data center.

18.     *Software Link's destruction of Austin Sports Center's Data*.  In August 2016, Austin Sports Center began receiving a series of e-mails from Software Link related to maintenance updates.  From August 4, 2016 to September 28, 2016, Austin Sports Center received a total of five maintenance update e-mails from Software Link.  Never once in this entire process of software updates did Software Link alert Austin Sports Center that its Data might be at risk, or that Austin Sports Center should procure additional backup tapes for its Data, or that Software Link's representations that it had a secure backup system in place were false.

19.     On October 3, 2016, Austin Sports Center attempted to retrieve its Data from the server, and discovered that all of its accounting software files and d:/ driver were missing.  When

Austin Sports Center attempted to access its QuickBooks file, it received a "Warning" message stating, "The company file you selected could not be found":



Austin Sports Center's Lindsay Dunn submitted an online ticket on October 3, 2016, reporting the missing information issue to Software Link, but received back an automated reply message. By the following day, Tucker Koch left multiple messages with Software Link, and also called the cell phone for Software Link's Senior Network Engineer, Brian Wilder, but could not get any answer regarding the missing Data.

20.     After Austin Sports Center made several attempts to contact Software Link through ticketed support systems and direct e-mails to Brian Wilder, a network engineer for Software Link, Brenda Cornelison, contacted Tucker Koch with Austin Sports Center on October 4, 2016, and stated that Software Link had had issues with an update, but that Software Link had copies of all of Austin Sports Center's Data.  Cornelison stated that Data from September 30 or October 1, 2016 would be restored within the next 24 hours.

21.     The Data was not restored, however, and Austin Sports Center continued to get computer messages that its Data was "not accessible" and that it was accessing an "invalid address":



On October 5, 2016, Koch e-mailed Wilder, "We are still missing our D drive on the environment.  This is now the 3rd day of us not accessing our financials. … Our employees need to get paid and quickbooks is our only way to make this happen."

22.    On October 6, 2016, Software Links' Brian Wilder spoke with Austin Sports Center's Tucker Koch and Arturo Castellanos about the missing Data, and advised that Austin Sports Center's entire virtual file store had been corrupted.  Despite the representation in the Agreement that Software Link provides "7/24 Server Monitoring," Wilder stated that Austin Sports Center's Data was corrupted on September 18, 2016, but went unnoticed by Software Link until September 30, 2017 (13 days later).[4]  Despite Software Link's prior representation that it kept 30 days of record backups for clients and that it maintained an independent backup site to the primary server, Wilder admitted that Software Link had <u>no</u> uncorrupted backups of Austin Sports Center's Data, and attributed that to a company policy to keep only 15 days of backups.[5]

---

[4] Software Link made no effort to disclose the corruption issue from Austin Sports Center after Software Link discovered the Data loss on September 30, 2016.  When Austin Sports Center discovered that its Data was missing on October 3, 2016 and submitted a ticket reporting the issue to Software Link, Software Link by its own admission had already known of the problem for three days.  Even after Austin Sports Center reported the problem, Software Link ignored multiple e-mails and telephone calls that Austin Sports Center placed to Software Link regarding the destroyed Data.

[5] During the contract negotiations, Software Link represented it kept 30 days of backups.  Since Software Link indicated it discovered the corruption on September 30, 2017, 13 days after the data became corrupted on September 18, it should have had at least 17 days of uncorrupted backup copies based on its representation during contract negotiations that it kept 30 days of backups.

Its subsequent statement that it kept only 15 days of backups also appears to be false.  On September 30, 2016, when Software Link finally noticed that the Data had been corrupted on September 18, it should

Wilder further stated that Software Link was opening up a negligence lawsuit against its software installer.  Despite Software Link's multiple representations regarding its own internal backups and multiple servers backing up data, and its contractual obligation not to disclose any Data to third parties without Austin Sports Center's "prior written consent," Wilder further stated that Software Link was waiting on a backup recovery file from a vendor, in hopes of restoring the Data.

23.    On October 7, 2016, Wilder e-mailed multiple personnel for Austin Sports Center, stating "Your server is back online."  The Data, however, was still missing.  Austin Sports Center thus continued to be unable to process payroll or access its financial information.  Over the next several days, Software Link continued to give false assurances that it could recover the Data.

24.    Contrary to these assurances, on October 14, 2016, Wilder advised Koch, "It look[s] like I am not going to be able to recover any files or data."  Contrary to Software Link's representation that it did "7/24 Server Monitoring," that it did multiple daily backups "to insure data is secure," that it had multiple servers backing up data with 30 days of backups, and that its services included responsibility for "verifying of the backup" and "restore processes," Wilder wrote Koch in November 2016:  "We do keep 15 Days of backups but we were backing up corrupted data, did not even know it," and that it did only a "spot check" in the backup software.

25.    _Software Link, not a third party, is responsible for the Data loss_.  At the November 21, 2017 hearing before this Court, Software Link stated that the loss of Austin Sports Center's Data was not caused by Software Link's malfeasance or its "sole" gross negligence, so

---

have at least two uncorrupted backup copies (predating September 18) based on the supposed 15-day retention.  Instead it had none.

as to fall outside of the limited contractual disclaimer of liability,[6] but instead was caused by the acts or omissions of an unnamed subcontractor of Software Link.  In light of that argument, this Court asked the parties to research and address whether a subcontractor to whom Software Link delegated contractual duties would be deemed an agent of Software Link, such that the agent's actions would be attributed as the acts of Software Link as principal.

26.     In its amended disclosures, Software Link appears to admit that there was no subcontractor after all, and instead argues that the *software* which Software Link uses in its business caused the Data loss.[7]  Regardless of how Software Link parses its argument,  however, the acts or omissions of an agent are "indistinguishable" from the actions of the principal, and are legally attributed as the acts of the principal itself.[8]  Software Link's sole gross negligence caused Austin Sports Center's injury.

27.     More importantly, Software Link's argument that it can be held liable only if it was the "sole" grossly negligent party is void as against public policy, as is any contractual

---

[6] The Agreement contains a limited waiver of liability, drafted entirely by Software Link, which disclaims liability for "claims arising from server down time, unavailability of services, loss of data, corruption of data, system errors, internet errors, or inappropriate use of the hosting system, <u>unless</u> such damages are caused by the sole gross negligence or malfeasance of Software Link."

[7] Software Link's amended disclosure identifies Brian Wilder as Software Link's Senior Network Engineer, and states:  "Mr. Wilder also has knowledge regarding software provided by a third-party vendor that was responsible for any alleged data loss and the use and malfunction of that software." Regardless of where Software Link bought supplies from, Software Link appears to acknowledge that the destruction of Austin Sports Center's Data occurred at Software Link.  In any event, nothing in the Agreement authorized Software Link to delegate any of the contractual duties it failed to perform, including the "7/24" monitoring and "Multiple daily backups to insure data is secure," or the separate backup that Software Link represented it would keep offsite or in its "disaster recovery site."

[8] *See, e.g., Thorne v. Allstate Texas Lloyd's*, 2012 WL 12941525 (W.D. Texas Nov. 27, 2012) (Yeakel, J.) (citing with approval "that <u>actions of agent are 'indistinguishable' from actions of principal</u>," and adding, "the agent's actions are 'indistinguishable' from the principal for the purpose of attributing liability to the principal by *respondeat superior*");  *Centro Cristiano Cosecha Final, Inc. v. Ohio Cas. Ins. Co.*, 2011 WL 240335 *14 (S.D. Tex. Jan. 20, 2011) ("These actions can be accomplished by Ohio through an agent, and as such, are indistinguishable from Ohio's actions.");  *Kris William Builders, Inc. v. Tranquility Lakes Owners Ass'n., Inc.*, 2015 WL 5770019 *5 (Tex. App. – Houston [1st Dist.] Sept. 29, 2015) ("'The acts of a corporate agent on behalf of his or her principal are ordinarily deemed to be the corporation's acts.'").

limitation on its liability for intentional torts: it cannot prospectively limit its liability for gross negligence, whether sole or joint.[9]   Similarly, the Agreement does not contain the statutorily-required bold typeface language for a valid waiver of potential liability under the Texas Deceptive Trade Practices Act ("DTPA").   Therefore, any such attempt by Software Link to contractually limit its DTPA liability is likewise void as a matter of law.[10]

28.   Just as importantly, Software Link's argument that it could have used a subcontractor to perform its duties is expressly *barred* in the Agreement itself.   The Agreement bars Software Link from giving any third parties access to the Data without Austin Sports Center's "prior written consent."   Leaving aside the public policy and statutory prohibitions against limitations on liability for gross negligence, DTPA violations, or intentional torts, Software Link could not attempt to insulate itself from liability by delegating its duties to a third party in the manner it suggested at the November 21, 2017 hearing: the Agreement itself barred it from doing so.   In addition to the provisions stating that "Software Link will assume responsibility" and perform the work itself, the Agreement provides:

> "Software Link acknowledges that Data is confidential and/or proprietary to Client [Austin Sports Center] and agrees not to disclose to any third party any Data without Client's prior written consent.   Software Link shall use commercially reasonable efforts to protect and safeguard Client's Data, such efforts no less than what Software Link uses to safeguard its own confidential information.

---

[9] *Zachry Const. Corp. v. Port of Houston Auth. of Harris County*, 449 S.W.3d 98, 116 (Tex. 2014) (Hecht, C.J.) ("We have indicated that pre-injury waivers of future liability for gross negligence are void as against public policy.   Generally, a contractual provision 'exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.'   We think the same may be said of contract liability.   To conclude otherwise would incentivize wrongful conduct and damage contractual relations.   This conclusion is supported by lower court decisions in Texas and court decisions in at least 28 American jurisdictions.   We join this overwhelming consensus.") (footnotes omitted).

[10] Tex. Bus. & Comm. Code § 17.42(a) ("Any waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void" unless it meets the requisites in that provision, including the specific bold typeface language stated in Section 17.42, which must include explicit reference to the DTPA).   In addition, Austin Sports Center was not represented by legal counsel in seeking Software Link's services, and therefore any attempt to waive the DTPA is again statutorily barred by Section 17.42(a)(3).

<u>Software Link will limit access</u> to the applicable operating system to <u>authorized individuals</u> with user passwords <u>assigned to Client</u>, and <u>authorized Software Link agents and personnel</u>, and will implement reasonable security measures that meet or exceed industry standards and are designed to <u>prevent unauthorized persons from accessing</u> the Software Link facilities, <u>client Data or the system</u>."

29.     In short, Software Link's argument at the hearing before this Court, regarding an unnamed subcontractor's responsibility for the loss, is contradicted by the express terms of the Agreement.  The Agreement does not provide for any delegation to third parties for Software Link's "responsibility" to perform the contractual services, its "7/24" server monitoring, the additional backup copies that Software Link represented it would maintain on several backup servers, or the other services and safeguards that Software Link represented orally and in the Agreement.  To the contrary, one of Software Link's contractual promises was that it would treat the Data as "confidential" and would *not* allow third-party access to it absent "prior written consent."[11]  No such prior written consent from Austin Sports Center was sought or obtained by Software Link.

30.     *Impact of the destruction of Data on Austin Sports Center*.  The data that Austin Sports Center has attempted to recreate has only been partially successful, and only through great difficulty and through reasonable and necessary expenditure of time and expense.  Since receiving the devastating news from Wilder that Software Link had lost all of its Data, and that Software Link would do nothing further to assist Austin Sports Center with the Data loss, Austin

---

[11] Leaving aside the public policy prohibition against any attempt to limit liability for Software Link's gross negligence, the reasonable interpretation of "sole gross negligence" in light of the provisions barring Software Link from giving access to the Data is that it refers to gross negligence as between Software Link and/or Austin Sports Center, not the gross negligence of a third party (since the Agreement on its face anticipates that no third party would be given access to the Data, and since all of the contractual duties described in the Agreement were Software Link's to perform without reference to any right to delegate same).  Software Link's argument that the phrase can include supposed negligence by inanimate software or companies from which it bought its supplies is nonsensical.  In any event, the phrase should be construed against the drafter, Software Link.  Similarly, on the face of the Agreement the reference to "malfeasance" is not limited to Software Link's "sole" malfeasance, and in any event, Software Link is barred by public policy from limiting its prospective liability for such conduct.

Sports Center staff and management have worked over 12,812 hours to recreate the data (through November 2017).  Austin Sports Center has also suffered damages by having to hire additional temporary staff for the sole purpose of recreating data.  Through Software Link's actions, Austin Sports Center has lost years of accounting and other data.  All such damages were proximately caused by Software Link's breaches of contract, tortious conduct, and statutory violations.

31.     Further, Austin Sports Center has had to forego business opportunities that it had planned to pursue because, without access to over three years of data, it could not obtain the proper financing from banks to do so.  The detrimental impact on Austin Sports Center's financing and other business operations was a foreseeable consequence of Software Link's misconduct and its loss of three years of data.

## V.  Causes of Action

### A.     Count I: Breach of Contract.[12]

32.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint herein.

33.     Software Link entered into a contract with Austin Sports Center to house and safeguard "all data and information relating to the business" of Austin Sports Center, including

---

[12] At the hearing on November 21, 2017, Software Link argued that breach of contract actions which allege gross negligence as a component of the breach must satisfy Fed. R. Civ. P. 9(b) pleading standards. The Court asked the parties to report back on their positions on that argument.

Software Link's argument at the November 21, 2017 hearing is incorrect.  *See, e.g., FDIC v. Williams*, 779 F. Supp. 63, 64 (N.D. Tex. 1991) (declining to apply 9(b) to allegations of gross negligence); *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 64 (2d Cir. 2012) (same).  Indeed, as stated in *Santander Consumer USA, Inc. v. Homer Skelton Enterprises, Inc.*, 2017 WL 2558804, at *3 (N.D. Tex. June 13, 2017), "A careful review of Fifth Circuit law indicates that applying 9(b) to a breach of contract claim is inappropriate."  *See also International Bancshares Corporation v. Bancinsure, Inc.*, No. SA-12-CA-686, 2012 WL 12864343, at *2 (W.D. Tex. Aug. 30, 2012) ("Rule 9(b) does not apply to breach of contract cases, even if the contract provides for coverage of fraudulent acts.").

Austin Sports Center nevertheless has undertaken in this amended complaint (as it did in its original petition) to plead all of the circumstances giving rise to each its causes of action with particularity, satisfying Rule 9(b).

its QuickBooks data, and agreed that it was responsible for performing, managing, and verifying the backup and restore process for Austin Sports Center's data.  Software Link contractually agreed that it would "protect and safeguard" Austin Sports Center's Data, and undertook a heightened duty that its efforts in that regard would be "no less than what Software Link uses to safeguard its own confidential information."  It agreed that "Software Link will assume responsibility for performing, managing, and verifying of the backup and restore processes for the Data."  It agreed that "A back-up tape or electronic copy of Data will be maintained offsite or in Software Link's disaster recovery site as determined by Software Link," and during negotiations represented to Austin Sports Center that it would keep 30 days of such backups.  It agreed that "If Data is lost from either system outage or application error, Software Link will recover the production database to a specific point in time, based on the most recent available backup," and that "Software Link will restore data from back-up tapes as requested by Client." It agreed that its "Services Included … Multiple daily backups to insure data is secure," "7/24 access" by Austin Sports Center to its applications, and "7/24 Server Monitoring."

34.     Software Link breached these obligations under the Agreement, and in doing so, permanently lost Austin Sports Center's Data.  Software Link breached the Agreement in virtually all of its aspects:  Software Link failed to "insure" that Austin Sports Center's Data was "secure," it failed to maintain 30 days of backups on multiple servers as represented to Austin Sports Center, it failed to "recover the production database to a specific point in time," it failed to "restore data from back-up tapes," and it failed to provide "7/24 access" to applications. Software Link also failed to perform around-the-clock "7/24 Server Monitoring" and "verifying of the backup and restore processes for the Data" (it admitted that it only did spot checks, and that the Data had been corrupted for 13 days before Software Link even noticed that fact).

35.     The conduct described above, and Software Link's resulting loss of the all Data, constitutes gross negligence (and also sole gross negligence by Software Link), for which Software Link is contractually liable, in that its acts and omissions objectively involved an extreme degree of risk considering the probability and magnitude of the potential harm to Austin Sports Center, and Software Link had actual subjective awareness of the risk involved but acted in conscious indifference to the rights, safety, or welfare of Austin Sports Center.  Software Link made the multiple oral and written representations in the Agreement regarding the levels of protection it would provide, evidencing its knowledge that such steps are necessary to avoid the risk of lost data.  Software Link made representations regarding its "7/24" monitoring, its multiple different servers as a backup to the primary server, its multiple daily backups, its 30 days of backup retention, that its efforts would be "no less than what Software Link uses to safeguard its own confidential information," its "verifying of the backup and restore processes for the Data," and its ability to "recover the production database," and multiple other safeguards, because Software Link knew those high levels of monitoring and protection are essential in order to fulfill its contractual promise to "insure data is secure," and without those levels of monitoring and security that there is an extreme degree of risk that data will be lost.  Software Link knew that consumers like Austin Sports Center require those extraordinary levels of protection and warranties as a condition to entrusting their Data.  The fact that Software Link did not keep the 30 days of backups that it represented it kept, and that it did not even determine that the Data was lost for 13 days (in contrast to its representations that it provided around-the-clock monitoring and that it verified its multiple daily backups), by themselves evidence its conscious indifference in the face of the extreme risk.  In light of Software Link's claim that it kept 15 days of backups, its failure to act promptly on September 30, 2017 to preserve what should have been two days of

uncorrupted Data further evidences its conscious indifference.

36.    As Software Link's own Senior Network Engineer wrote on October 14, 2016, the consequence of Software Link's derelict acts and omissions was a catastrophic loss of Austin Sports Center's Data:  "It look[s] like I am not going to be able to recover any files or data." Software Link's breach of the terms of the Agreement has proximately caused all of the damages recited above that have been suffered by Austin Sports Center, for which Austin Sports Center is entitled to recovery against Software Link.

37.    The facts stated above also establish that Software Link breached the Agreement through the commission of reckless mistakes, which resulted in the destruction of Austin Sports Center's Data.  As stated above, the Agreement's limited waiver of liability was drafted entirely by Software Link.  It contains an exception which makes Software Link liable for server down time, unavailability of services, loss of data, corruption of data, system errors, internet errors, or inappropriate use of the hosting system, arising out of the "malfeasance" of Software Link. "Malfeasance," which Software Link chose to use when it drafted that clause of the Agreement, includes "reckless mistake," acts of "misrepresentation or deception," and other wrongful acts, and therefore are actionable against Software Link under the Agreement.[13]   Software Link's malfeasance (and consequent breach of the terms of the Agreement) has proximately caused all of the damages recited above that have been suffered by Austin Sports Center, for which Austin

---

[13] As cited above, the limitation of liability in the Agreement does not bar claims for gross negligence (sole or otherwise), DTPA violations, or intentional torts including fraud.  In any event, fraud, DTPA violations, and other wrongful acts are species of "malfeasance" which is expressly carved out of the limitation of liability clause.  In the event that "malfeasance" is determined to be ambiguous, that phrase must be construed against the drafter of the Agreement and that clause, Software Link.  *See Peeler v. Hughes & Luce*, 909 S.W.2d 494, 498 (Tex. 1995) ("A plaintiff suing under the DTPA must prove that the defendant's malfeasance was the producing cause of his damages.");  *Industrias Magromer Cueros y Pieles S.A. v. La. Bayou Furs Inc.*, 293 F.3d 912, 920, *op. clarified on other grounds*, 310 F.3d 786 (5th Cir. 2002) (per curiam) (Black's Law Dictionary defines malfeasance as a "'wrongful or unlawful act'"). *Compare Suggs v. Nationwide Ins. Co.*, 2007 WL 3010524 *3 (E.D. Pa. Oct. 16, 2007) (Malfeasance is such affirmative conduct "as an act of misrepresentation or deception, or a reckless mistake made").

Sports Center is entitled to recovery against Software Link.

38.     For the same reason, the allegations stated below relating to violations of the DTPA constitute malfeasance as well.  In addition to the violations giving rise to a separate cause of action against Software Link under the DTPA, those DTPA violations are also actionable against Software Link under the terms of the Agreement as malfeasance.  Software Link's DTPA violations (and consequent breach of the terms of the Agreement) is a proximate and producing cause of all of the economic damages recited above that have been suffered by Austin Sports Center, for which Austin Sports Center is entitled to recovery against Software Link.

**B.     Count II: Fraudulent Inducement.**[14]

39.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint herein.

40.     The facts stated above constitute fraudulent and reckless misrepresentation by Software Link to induce Austin Sports Center to enter into the Agreement.  Software Link falsely represented to Austin Sports Center that it would perform the services described above, including that it was providing "7/24 Server Monitoring," that it had multiple servers backing up "multiple daily backups," that it verified those multiple daily backups on the multiple servers and verified its restore processes, that it kept 30 days of those multiple backups, and that its efforts would be "no less than what Software Link uses to safeguard its own confidential information."

41.     Software Link subsequently admitted that it kept only 15 days of backups, instead

---

[14] *Id*.  "Malfeasance" under the Agreement also encompasses fraud.  *See also AHF-Arbors at Huntsville I, LLC v. Walker County Appraisal Dist.*, 410 S.W.3d 831 (Tex. 2012) (in context of piercing the corporate veil, referring to "circumstances of fraud or other malfeasance"); *First State Bank of Miami v. Fatheree*, 847 S.W.2d 391, 395 (Tex. App. – Amarillo 1993, writ denied) (noting that although "fraud cannot or should not be precisely defined, the books contain many definitions such as: ... malfeasance").

of 30 days.  It did not verify all of the backups it performed, and instead admitted it only did spot checks.  It did not provide around-the-clock monitoring or verification, and instead let 13 days elapse before it even noticed that all of Austin Sports Center's Data was corrupted.  Software Link's utter failures to perform the levels of safeguards, monitoring, and performance that it represented to Austin Sports Center evidence its lack of good faith and intent to perform the services as represented, and to maintain the levels of protection that were promised.[15]   In the alternative, those facts show that Software Link acted with reckless disregard for the truth or falsity of the representations it made to Austin Sports Center.

42.     Software Link made these false representations because it knew that Austin Sports Center required the backup server and those levels of safeguards in order to entrust Software Link with its extremely valuable financial data.  Austin Sports Center reasonably relied on Software Link's false representations to its detriment, including by entrusting its Data to Software Link to manage and secure, and would not have entered into the Agreement but for Software Link's false representations.

43.     Software Link's fraudulent and reckless misrepresentations proximately caused all of the damages recited above that have been suffered by Austin Sports Center, for which

---

[15] *See, e.g., Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 394-95 (5th Cir. 2010) (noting that "a party's intent may be inferred by the party's subsequent acts following the representation," adding that a failure to perform is a "circumstance to be considered with other facts to establish intent."  "Even 'slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent.'");  *Elliott v. Whitten*, 2004 WL 2115420 *7 (Tex. App. - Houston [1st Dist.] Sept. 23, 2004, pet. denied) ("Because intent to defraud cannot normally be shown by direct proof, that intent must usually be proved by circumstantial evidence.  Such circumstantial evidence may include the party's subsequent acts, even though the party's relevant intent is his intent at the time that he made the misrepresentation. For example, although the mere failure to perform a contract, standing alone, is not evidence of fraud, the subsequent failure to perform 'is a circumstance to be considered with other facts to establish intent .'  'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent.'  Similarly, a party's denial that he ever made the promise may be a factor showing no intent to perform when he made the promise.") (citations omitted).

Austin Sports Center is entitled to recovery against Software Link.   Austin Sports Center therefore is entitled to recover its actual damages and exemplary damages from Software Link.

**C.      Count III: Violation of the Texas Deceptive Trade Practices Act ("DTPA").**

44.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint herein.

45.     Austin Sports Center is a consumer within the meaning of Tex. Bus. & Comm. Code § 17.45(4).   Austin Sports Center purchased the services of Software Link to house, safeguard, and manage its financial Data, as well as to provide Austin Sports Center with an independent backup of Austin Sports Center's Data and to manage and verify the security of Austin Sports Center's Data on that system.

46.     The facts stated above establish that Software Link made representations regarding the characteristics, uses, benefits, and qualities of Software Link's services, which they did not have, represented that the Agreement had remedies which it did not have and rights by Software Link which are prohibited by law, and failed to disclose information concerning its services which were known by Software Link at the time it entered into the Agreement which was intended to induce Austin Sports Center into the transaction, and in which Austin Sports Center would not have entered had such information been disclosed, all in violation of Tex. Bus. & Comm. Code §§ 17.46(b)(5), (7), (12), (24), and 17.50(a)(1).   Among other material misrepresentations, Software Link represented to Austin Sports Center that it backed its Data onto multiple backup servers, that it performed multiple daily backups which would "insure data is secure" even in the event that the primary server failed, that it would assume responsibility for "performing, managing, and verifying of the backup and restore processes for the Data," and that it would provide "7/24 Server Monitoring," and that Austin Sports Center would have "7/24

access."  It represented that it kept 30 days of backups, and that if Data were lost "Software Link will recover the production database."

47.     As detailed above, Software Link's services did not comply with Sections 17.46(b)(5), (7), (12), and (24) of the DTPA.  In contrast to the representation that Software Link kept 30 days of backups, it admitted it kept only 15 days.  In contrast to the representation that it provided "7/24 Server Monitoring" and that it assumed responsibility for "verifying of the backup and restore processes for the Data," Software Link subsequently admitted that it did only spot checks and that the Data was corrupted for 13 days before Software Link discovered the loss.  In contrast to its multiple representations that it performed multiple daily backups to "insure data is secure," it did not insure Austin Sports Center's Data was secure, and instead permanently lost that information.  In contrast to its representations about maintaining a separate backup of the Data "offsite or in Software Link's disaster recovery site" from which it could restore any lost Data, Software Link admitted it did not have such a backup system and could not recover the Data, and that it did not verify any such backups to insure that they were not corrupted and unusable.  In contrast to Software Link's representation that "will recover the production database" in the event Data is lost, Software Link acknowledged that it permanently lost Austin Sports Center's Data and would not be "able to recover any files or data."

48.     Austin Sports Center reasonably relied on Software Link's false, misleading, and deceptive acts and practices to its detriment, including by entrusting its data to Software Link to manage and secure, and would not have entered into the Agreement but for Software Link's false, misleading, and deceptive acts and practices.  Software Link's false, misleading, and deceptive acts and practices in connection with Software Link's services is a producing cause of Austin Sports Center's economic damages.  Austin Sports Center made written demand on

Software Link more than 60 days before filing suit in compliance with the requirements of Tex. Bus. & Comm. Code § 17.505.

49.     Software Link is liable for its violations of Sections 17.46(b)(5), (7), (12), (24), and 17.50(a)(1) even in the absence of any intent to misrepresent.[16]  The nature of Software Link's acts and omissions described above, however, show that its DTPA violations were committed knowingly within the meaning of Tex. Bus. & Comm. Code § 17.50(b)(1), entitling Austin Sports Center to recover three times the amount of its economic damages from Software Link.  For example, as set forth above, Software Link knew it did not have the 30 days of backups that it stated it kept, that it did not have multiple servers that it monitored "7/24," and that it did not verify multiple daily backups on such servers.  Austin Sports Center is entitled to recover from Software Link its economic damages, treble damages, and attorney's fees in connection with Software Link's violations of the DTPA.

## VI.  Attorneys' Fees

50.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint herein.

51.     Plaintiffs are entitled to recover their reasonable and necessary attorney's fees and costs of court incurred in bringing this action, including under Tex. Bus. & Com. Code § 17.50(d) and Tex. Civ. Prac. & Rem. Code § 38.001, *et seq*.

## VII.  Conditions Precedent

---

[16] *Miller v. Keyser*, 90 S.W.3d 712, 716 (Tex. 2002) ("A consumer is not required to prove intent to make a misrepresentation to recover under the DTPA."); *Tex. Real Estate Comm'n v. Asgari*, 402 S.W.3d 814, 819 (Tex. App.–San Antonio 2013, no pet.) (same);  *Smith v. Herco, Inc.*, 900 S.W.2d 852, 859 (Tex. App.–Corpus Christi 1995, writ denied) ("Intent to misrepresent, or knowledge that a representation is untrue, has never been an element of a DTPA 'laundry list' claim unless the specific provision requires intent.");  *Coleman v. Dean*, 2015 WL 5156921 *5 n. 6 (Tex. App. – San Antonio Sept. 2, 2015) (Section 17.46 "laundry list" violations do not require intent, except in four subsections which explicitly reference intent as an element).

52.    All conditions precedent have been performed or have occurred, including all conditions precedent to Plaintiffs' rights to recover as set forth herein.  Fed. R. Civ. P. 9(c).

## PRAYER

WHEREFORE, premises considered, Plaintiffs respectfully request that the Court enter judgment awarding them:

1.    Plaintiffs' economic and other actual damages;

2.    Exemplary damages;

3.    Treble damages in connection with economic damages awarded to Plaintiff;

4.    Plaintiffs' reasonable and necessary attorney's fees, costs of court, and other costs incurred in bringing this action;

5.    Pre- and post-judgment interest on the foregoing amounts as allowed by law, and at the highest rate allowed by law;

6.    Such other and further relief, at law or in equity, to which Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, TX  78701
(512) 480-5738
(512) 480-5838 (facsimile)

By:   */s/ Susan P. Burton*
Susan P. Burton
State Bar No. 03479350
sburton@gdhm.com
Eric G. Behrens
State Bar No. 02050700
ebehrens@gdhm.com

ATTORNEYS FOR JUNIOR VOLLEYBALL ASSOCIATION OF AUSTIN d/b/a/ AUSTIN SPORTS CENTER, and AUSTIN SPORTS CENTER, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2017, a true and correct copy of the foregoing was served upon all counsel of record through the Court's CM/ECF filing system.

*/s/ Eric G. Behrens*
Eric G. Behrens

| Application Hosting Terms and Conditions |  Software Link<br>Complete Technology Solutions |
|---|---|

### Service Included

- 7/24 access to your applications via the Internet
- Multiple daily backups to insure data is secure
- Tech support for on connectivity issues
- 7/24 Server Monitoring
- Application Hosting per attached Exhibit A

### Services Not Covered

The following is not covered under this agreement:

- This agreement does not cover support of Software being hosted. Software support plans can be purchased separately from your current provider or from the Software publisher.
- This agreement does not cover support on end user systems owned by Client. This includes desktop computers, printers, internet equipment, or any other devices needed to access our systems. Software Link can provide IT services on the end user systems at a rate of $99 for the first hour (1 hour minimum) and $135 per hour for each additional hour.
- 3rd party software installations of support.
- System restores due to data corruption caused by the end user.

### Client Acknowledgement

Client acknowledges responsibility for setup and administration of third party applications loaded on hosted server. The hosting agreement price includes only support for connectivity and printing issues. For other services additional fees may apply.

Client Initial: _TK_

Data on hosted server will be deleted from the server after 30 days of account going into nonpayment or default status. Myownasp.com will not be responsible for loss of data due to these circumstances.

Client Initial: _TK_

### Client Contact Information

Company Name: Austin Sports Center
Company Address: 425 Woodward
City, State and Zip Code: Austin TX 78704
Contact Phone: 512-260-0333 ext 206
Contact name: Tucker Koch
Email address: tucker@austinsportscenter.com

### Communications Process For Support

Communications process

All new support requests from the Client should be submitted at our support portal on the web http://ticket.myownasp.com. The support portal is monitored by myownasp.com engineers 24x7x365.

- Once the ticket is resolved the engineer will update and close the ticket and a resolution summary email will be sent to the contact on the request.

Accepted this _3_ day of _February_, 2012 by:

Authorized officer of: Austin Sports Center
Signature _Tucker Koch_

Authorized officer of Software Link, Inc.

Signature _____

Software Link
6230 Shiloh Rd. Suite 100
Alpharetta, GA 30005
770-569-5889 fax 770-569-5897
www.software-link.com

  

  

### Client Data

"Data" shall mean all data and information relating to the business of Client and its affiliates provided to, generated, collected, processed or stored by Software Link in connection with the Services, including any data contained in reports required to be provided by Software Link to Client under this Agreement. Client Data does not include internal data of Software Link generated in connection with the performance of the Services and not reasonably related to its obligations under this Agreement (e.g., Software Link cost data).

Software Link acknowledges that Data is confidential and/or proprietary to Client and agrees not to disclose to any third party any Data without Client's prior written consent. Software Link shall use commercially reasonable efforts to protect and safeguard Client's Data, such efforts no less than what Software Link uses to safeguard its own confidential information.

Software Link will limit access to the applicable operating system to authorized individuals with user passwords assigned to Client, and authorized Software Link agents and personnel, and will implement reasonable security measures that meet or exceed industry standards and are designed to prevent unauthorized persons from accessing the Software Link facilities, client Data or the system.

Software Link will assume responsibility for performing, managing, and verifying of the backup and restore processes for the Data.  A back-up tape or electronic copy of Data will be maintained offsite or in Software Link's disaster recovery site as determined by Software Link.  If Data is lost from either system outage or application error, Software Link will recover the production database to a specific point in time, based on the most recent available backup.  In addition, Software Link will restore data from back-up tapes as requested by Client.

### Indemnification/Liability

Users shall indemnify and hold harmless Software Link, its agents and employees, from any and all claims, judgments, damages, penalties, fines, costs, losses or liabilities (including without limitation, reasonable attorneys' fees and court costs), to the extent that such claims are proximately caused in whole or part by the negligent act or omission or wilful misconduct of Client or Users. Software Link shall not be liable for any claims arising from server down time, unavailability of services, loss of data, corruption of data, system errors, Internet errors, or inappropriate use of the hosting system, unless such damages are caused by the sole gross negligence or malfeasance of Software Link. This provision shall survive the expiration or termination of this agreement with respect to any damages occurring before such expiration or termination.

Terms: This is a month to month contract. 30 days written notice is required in order to cancel contract.

- Monthly service fees of $_1600_ are due on the first of every month and are payable by Visa, MasterCard, and ACH direct deposit. We will prorate month if service is started in the middle of the month.
- First Month and Last Month of fees are required.
- Billing begins when server is configured and ready for the first login.
Method of Payment:___Credit Card (___Visa ___Mastercard ___American Express)

Credit Card Number: _REDACTED_ _____ Expiration Date: _11/13_. Name on Credit Card: _Tucker Koch_ Address Statement is mailed to: _425 Woodward Austin TX 78704_

Authorization of Cardholder: _Tucker Koch_ ___Email address___

EXHIBIT
A

